Andrew R. Missel (OSB # 181793)
Lauren M. Rule (OSB # 015174)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 506-5133
amissel@advocateswest.org
lrule@advocateswest.org

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **ADVOCATES FOR THE WEST**, | Case No.: 3:22-cv-1944 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| **BONNEVILLE POWER ADMINISTRATION**, | |
| Defendant. | |

INTRODUCTION

1. Plaintiff Advocates for the West ("AFW") brings suit under the Freedom of Information Act ("FOIA") to compel the Bonneville Power Administration ("BPA") to produce certain records and portions of records requested by AFW.

2. The records at issue concern BPA's relationship with Kintama Research Services and its CEO, Dr. David Welch (collectively, "Kintama"). Kintama is a Canadian research

COMPLAINT                                    1

company specializing in the "design, deployment and operation of large-scale and cost-effective underwater acoustic telemetry arrays."[1]

3. BPA has funded some of Kintama's research, including studies over the last 10 years dealing with the causes of declines in salmon populations in the Pacific Northwest. Kintama is a proponent of the theory that ocean conditions, rather than the hydroelectric dams managed in part by BPA, are the main driver of declining Columbia Basin salmon populations.

4. AFW sent a FOIA request to BPA on March 29, 2021, seeking information about BPA's relationship with Kintama, including communications between BPA and Kintama. Eighteen months later, BPA finally finished releasing responsive records to AFW.

5. BPA released nearly 9,000 pages of records to AFW, but it redacted all or part of more than 1,500 of those pages under FOIA's Exemption 5, which allows agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency . . . ." 5 U.S.C. § 552(b)(5). The majority of the material that BPA withheld under Exemption 5 consists of email correspondence between Kintama and various BPA employees.

6. Because Exemption 5 covers only "inter-agency or intra-agency" materials, communications between BPA and Kintama cannot be withheld under that exemption unless Kintama was acting "in a capacity similar to that of an employee" with respect to those communications. *Rojas v. FAA*, 989 F.3d 666, 674–75 (9th Cir. 2021) (en banc).

7. However, far from being akin to a BPA employee, Kintama was at all relevant times an independent entity: BPA repeatedly reaffirmed Kintama's independence, and Kintama certified to peer-reviewed scientific journals that BPA had played no role in shaping its research or its scientific conclusions.

---

[1] http://kintama.com/

COMPLAINT                                            2

8. Kintama's status as an outsider was key for both BPA and Kintama. Accordingly, Kintama was never acting "in capacity similar to that of [a BPA] employee," and BPA cannot withhold any records of its communications with Kintama under Exemption 5.

9. For this and other reasons, this Court should order BPA to disclose all records and portions of records responsive to request BPA-2021-00513-F that have been improperly withheld under Exemption 5.

## JURISDICTION AND VENUE

10. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States. In addition, FOIA itself provides a basis for jurisdiction. 5 U.S.C. § 552(a)(4)(B).

11. Venue is proper in this Court under 5 U.S.C. § 552(a)(4)(B) because the records at issue are, on information and belief, located in the District of Oregon at the headquarters of BPA. Venue is proper in the Portland Division because BPA's headquarters are in Portland.

12. The federal government waived sovereign immunity in this action pursuant to 5 U.S.C. § 552(a)(4)(B).

13. AFW has exhausted all administrative remedies. AFW filed an administrative appeal of BPA's final "determination" within 90 days of the date of that determination. 10 C.F.R. § 1004.8(a). The Department of Energy Office of Hearings and Appeals finished processing that appeal on November 21, 2022.

## PARTIES

14. Plaintiff Advocates for the West ("AFW") is a public interest, non-profit environmental law firm headquartered in Boise, Idaho, with an office in Portland, Oregon. AFW's mission is to defend western public lands, waterways, and wildlife on behalf of conservation groups and concerned citizens. AFW is particularly interested in gathering information to inform itself, its clients, its allies, and the public about BPA's activities and how those activities affect threatened and endangered fish species.

15. AFW educates the general public about the natural wonders of the West, and about land, resource, and wildlife decisions made by governmental and private entities that affect the natural environment and wildlife. AFW is effective at increasing public awareness of environmental matters, such as protection of endangered and threatened species, through public education and outreach activities: it employs a full-time Communications and Engagement Director who helps educate the public about the organization's efforts to protect the American West; it sends regular updates to its email list of over 2,500 recipients; it maintains an active social media presence; it routinely disseminates materials and information through its website and webinars; and it regularly engages in activities that attract the attention of the national news media, allowing for wide dissemination of information obtained directly or indirectly from FOIA requests. AFW also routinely shares information it has gathered with its clients and with allied conservation and environmental organizations.

16. Defendant Bonneville Power Administration ("BPA") is a federal power marketing administration that is part of the Department of Energy. "BPA is the marketing authority for almost all federally generated electric power in the Pacific Northwest." *Confederated Tribes of Umatilla Indian Reservation v. Bonneville Power Admin.*, 342 F.3d 924, 928 (9th Cir. 2003). BPA is an "agency" within the meaning of 5 U.S.C. § 551 and is subject to FOIA.

## LEGAL BACKGROUND

17. The Freedom of Information Act ("FOIA") is intended "to ensure an informed citizenry, promote official transparency, and provide a check against government impunity." *Transgender Law Ctr. v. Immig. & Customs Enforcement*, 46 F.4th 771, 777 (9th Cir. 2022). To help achieve those ends, FOIA is construed in favor of disclosure, and its exemptions are construed narrowly. *Milner v. Dep't of Navy*, 562 U.S. 562, 571 (2011).

18. One exemption that agencies may use to shield information from public view is Exemption 5. Exemption 5 allows agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in

litigation with the agency . . . ." 5 U.S.C. § 552(b)(5). "Successful invocation of the exemption requires an agency to show that a document (1) is 'inter-agency' or 'intra-agency' in character, and (2) consists of material that would be protected as privileged in the civil discovery context." *Rojas*, 989 F.3d at 672.

19. Communications between an agency and a private entity outside the government may be withheld under Exemption 5 only if the outside entity "acted in a capacity functionally equivalent to that of an agency employee" with respect to the communications. *Rojas*, 989 F.3d at 675. This is called the "consultant corollary" to Exemption 5. *Id.*

20. Where the private entity was pursuing its own interests, or where the private entity's "outsider status was essential to [its] work," it cannot be said to be functionally equivalent to an agency employee, and its communications with the agency cannot be withheld under the consultant corollary. *Id.* at 675 & 675 n.3. Nor can communications be withheld where they concern a "decision . . . made by the outsider, not by the agency." *Judicial Watch, Inc. v. Dep't of State*, 306 F.Supp.3d 97, 107–08 (D.D.C. 2018).

21. Even where documents exchanged between an agency and a private entity may be deemed "intra-agency" under the "consultant corollary," they cannot be withheld under Exemption 5 unless they are both "pre-decisional" and "deliberative." A document is "pre-decisional" if it was "prepared to assist an agency decisionmaker in arriving at a decision, rather than to support a decision already made." *Campaign Legal Ctr. v. U.S. Dep't of Justice*, 34 F.4th 14, 23 (D.C. Cir. 2022) (cleaned up). And a document is "deliberative" if it "reflects the give-and-take of the consultative process." *Id.* (cleaned up). "To demonstrate that a document is deliberative, the government must explain the role it played in administrative decisionmaking—the 'who, what, where, and how' of internal governmental deliberations." *Id.*

22. In addition, an agency cannot withhold a record or portion of a record under Exemption 5 unless "the agency reasonably foresees that disclosure would harm an interest protected by [the] exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I). An agency cannot meet this burden

by relying on "mere speculative or abstract fears, or fear of embarrassment." *Reporters Cmte. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (cleaned up).

## STATEMENT OF FACTS

**BPA and Kintama's Relationship**

23. Kintama is a Canadian company that has worked with BPA on and off for nearly 20 years.

24. In 2016, Kintama and BPA began negotiating a contract for Kintama to conduct research on the causes of declines in salmon populations in the Pacific Northwest.

25. Kintama and BPA negotiated this contract throughout late 2016, passing draft contracts and other materials back and forth by email. BPA has withheld large portions of these emails and attachments thereto, even though they pre-date the contract signing and reflect negotiations between parties pursuing their own interests.

26. Eventually, BPA and Kintama signed a contract in early 2017, numbered Contract 75025. The contract stated that Kintama would "provide novel information to BPA [and other agencies] on comparative fresh water and early marine survival rates of Columbia River spring Chinook populations and publish the analysis and their implications for management in a reputable, high ranking scientific journal." The contract also specified the following regarding Kintama's scientific independence:

> After a draft manuscript [of a scientific paper] is completed, Kintama will provide BPA staff with an opportunity to review and provide feedback on the findings. Any technical comments can be taken into account, but BPA will not require any changes to be made. In order to maintain scientific independence, our request is that BPA staff confine their comments to the application of the scientific findings to management so that Kintama can identify and expand upon those areas deemed of greatest importance for translating the scientific findings into useful management advice. Kintama staff will retain sole scientific authority over the scientific analysis and publication of the results.

27. BPA and Kintama quickly modified the contract in May 2017 to include additional work elements, including the preparation of a second article for submission to a peer-reviewed journal. The modified contract was set to expire on January 31, 2019.

28. Throughout 2017, Kintama and BPA employees communicated with one another about Kintama's research. Kintama gave virtual presentations to BPA in July 2017 and October 2017, updating the agency on the progress of Kintama's research.

29. In August 2018, Kintama gave an in-person presentation at BPA headquarters. The presentation reported the findings contained in a draft article entitled "The coast-wide collapse in marine survival of west coast Chinook and steelhead: simply a slow-moving catastrophe or a deeper failure?"

30. In September 2018, Kintama gave another presentation as part of BPA's Technical Service Contractor Retreat. Large portions of records sent to Kintama by BPA regarding this retreat have been redacted under Exemption 5.

31. In October 2018, BPA and Kintama agreed to modify Contract 75025 to add additional funds for Kintama to complete its first article and begin work on the second.

32. In November 2018, Kintama submitted its first paper to *PLOS Biology*, a peer-reviewed scientific journal. At the same time, Kintama posted the draft paper to bioRxiv.org, a "preprint server" containing pre-publication versions of biology papers. The version of the paper available on bioRxiv.org states that BPA "played no role in the design of [Kintama's] study nor the conclusions reached." On information and belief, Kintama made this same representation to *PLOS Biology*.

33. The central conclusion of Kintama's paper was that ocean conditions, not dams, are largely responsible for declines in salmon and steelhead populations in the Columbia Basin.

34. Kintama's paper was rejected by *PLOS Biology* in early 2019. The peer reviewers who examined the paper found it to be "lacking on key issues," with one reviewer noting that the paper's conclusions "ha[d] no statistical support because there was no statistical analysis."

35. Despite Kintama's avowed scientific independence, large portions of the communications between BPA and Kintama regarding the *PLOS Biology* paper have been withheld under Exemption 5. This includes many communications that appear to concern *Kintama*'s decisions rather than BPA's decisions.

COMPLAINT                                                              7

36. In February 2019, Kintama and BPA entered into a new contract—Contract 81498. The new contract set out two objectives: (1) to revise the first paper and resubmit it to another journal and (2) to finish the second paper and submit it to a peer-reviewed journal. At the time of the contract, the working title of the second paper was "The contribution of hydrosystem survival to adult return rates of Snake River Yearling Chinook Salmon." The new contract was set to expire at the end of January 2020.

37. At some point in the spring of 2019, Kintama was invited to speak about its recent BPA-funded research at the combined 2019 Idaho Consumer-Owned Utilities Association Annual Meeting/BPA Annual Customers' meeting in Boise, Idaho (the "ICUA Meeting"). Kintama informed BPA about this invitation, prompting a back-and-forth about the need to possibly "coordinate" Kintama's presentation with presentations being given at the meeting by BPA executives.

38. Throughout this exchange, BPA employees reaffirmed Kintama's status as an independent outsider:

   a. One BPA employee wrote to Kintama that "[w]e have previously discussed extensively how we regard you as independent scientists," and then provided some "recommendation[s]" to Kintama about its presentation.

   b. A different employee wrote that he "respect[ed] [Kintama's] scientific autonomy but appreciate[d] the communication and transparency" regarding Kintama's upcoming presentation at the ICUA Meeting.

   c. A third BPA employee wrote that BPA "appreciate[d] early notification of any requests to present BPA-funded research," but gave "full recognition [to] Kintama's explicit scientific independence." The employee wrote that BPA did "not intend to shape [Kintama's] research," but that "early communication does enable us to effectively coordinate." The BPA employee asked Kintama to "please consider" certain points in developing its presentation for the ICUA Meeting.

39. Large portions of the exchange between Kintama and BPA regarding Kintama's presentation at the ICUA Meeting have been withheld by BPA under Exemption 5, despite the fact that Kintama gave that presentation on its own behalf and not on BPA's behalf, and despite the fact that the communications concerned Kintama's decisionmaking process rather than BPA's.

40. In January 2020, about six months after Kintama gave its presentation at the ICUA Meeting, BPA and Kintama modified their existing contract (Contract 81498). The modified contract eliminated the preparation and submission of the second paper as a work element, and it extended the end date for the work related to the first paper to the end of March 2020.

41. In late March 2020, Kintama submitted a revised version of its first paper—the one rejected by *PLOS Biology* a year earlier—to the journal *Fish and Fisheries*. Kintama represented to *Fish and Fisheries* that BPA had "played no role in the design of the study nor the conclusions reached."

42. Despite Kintama's independence from BPA, BPA has redacted many portions of its communications with Kintama regarding the *Fish and Fisheries* paper, citing Exemption 5. Many of these communications appear to bear little relation to any BPA decisionmaking process; they instead concern Kintama's own decisions regarding its research and the publication of its paper.

43. Following the submission of the *Fish and Fisheries* paper, Kintama sent a final invoice to BPA and stated that it had "close[d] out the agreed-upon work" under the contract.

44. In June 2020, Kintama gave a virtual presentation to BPA regarding the revised paper it had submitted to *Fish and Fisheries*. At that time, there was no active contract between BPA and Kintama. Despite Kintama's scientific independence and the fact that Kintama and BPA had no contract in June 2020, BPA has redacted several portions of communications between itself and Kintama regarding the June 2020 presentation, citing Exemption 5.

45. Throughout the rest of 2020, Kintama communicated sporadically with various BPA employees. BPA has withheld portions of these communications, despite the facts that Kintama had no contractual relationship with BPA at that time, that many of the communications were only tangentially related to the work that Kintama had performed under its contracts with BPA, and that many of the communications appear to relate to discussions of possible future work under a new contract.

46. Kintama's paper was accepted for publication by *Fish and Fisheries* in September 2020.

47. In February 2021, Kintama gave a presentation about its work to the Independent Scientific Advisory Board, a body that advises the Northwest Power and Conservation Council. Following that presentation, Kintama and BPA communicated with one another. BPA has redacted several portions of these communications, despite the fact they took place nearly a year after the expiration of Kintama's last contract with BPA.

48. In March 2021, following the publication of the *Fish and Fisheries* paper, a fisheries biologist at the Idaho Department of Fish and Game contacted the editors of *Fish and Fisheries* to point out "several errors in the [paper's] analysis which would invalidate some of the authors' conclusions." Kintama and BPA corresponded regarding this criticism; portions of those communications have been withheld by BPA, despite the fact that they occurred nearly a year after the expiration of Kintama's last contract with BPA, concerned a scientific paper over which BPA had no scientific control, and do not appear to relate to any BPA decisionmaking process.

**AFW's FOIA Request**

49. On March 29, 2021, AFW, along with non-party Columbia Rediviva, sent a FOIA request to BPA, which was assigned the request number BPA-2021-00513-F. In the request, AFW sought information concerning BPA's relationship with Kintama. Specifically, AFW sought (1) all contracts between BPA and Kintama from 2000 to the date of search, (2) all communications between BPA and Kintama from 2000 to the date of search, and (3) all records

from 2000 to the date of search mentioning or documenting meetings or communications between BPA and Kintama. *See* Ex. 1 (FOIA request).

50. BPA formally acknowledged AFW's request on April 12, 2021. *See* Ex. 2. BPA made a first partial release on December 16, 2021, and a second partial release on March 21, 2022. BPA did not withhold any information under Exemption 5 in those two releases.

51. On June 28, 2022, BPA made a third partial release of information consisting of 6,942 pages of records. BPA withheld all or part of 1,172 pages under Exemption 5. *See* Ex. 3. On July 12, 2022, counsel for AFW responded to BPA with concerns about the adequacy of the agency's explanations of withholdings under Exemption 5. *See* Ex. 4. BPA responded to that email on September 9, 2022, providing a slightly more detailed explanation for its withholdings; it also released portions of a few records that had been withheld in the June 28 release. *See* Ex. 5.

52. On September 29, 2022, BPA made a fourth and final release, consisting of 1,709 pages of records. BPA redacted all or part of 354 pages under Exemption 5. *See* Ex. 6.

53. BPA explained its Exemption 5 withholdings in general terms, failing to tie each redacted record or portion of a record to a specific agency decision. Moreover, BPA did not explain how Kintama was acting "in capacity similar to that of [a BPA] employee" with respect to each redacted record—indeed, BPA did not even acknowledge that it was relying on the consultant corollary in any of its response letters. BPA provided a conclusory explanation for how release of the withheld records would harm the interests protected by Exemption 5.

54. On October 28, 2022, AFW filed an administrative appeal with the Department of Energy Office of Hearings and Appeals ("OHA"). AFW challenged all of BPA's withholdings under Exemption 5.

55. On November 21, 2022, OHA dismissed in part and denied in part AFW's administrative appeal. OHA ruled that AFW's appeal of the withholdings claimed in the third partial release was untimely because it was filed more than 90 days after the third partial release; accordingly, OHA dismissed AFW's appeal as to those withholdings. OHA denied AFW's appeal as to the withholdings in the fourth partial release.

**CLAIM FOR RELIEF**

**IMPROPER WITHHOLDING OF RECORDS UNDER EXEMPTION 5**

56. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 55, inclusive.

57. In its response to AFW's FOIA request, BPA withheld all or part of 1,526 pages of responsive records under Exemption 5. The vast majority of the withheld records consist of emails between BPA and Kintama and attachments to those emails.

58. At no point has Kintama been part of BPA or any other federal agency. Accordingly, BPA can only withhold its communications with Kintama under the so-called "consultant corollary" to Exemption 5.

59. To properly invoke the "consultant corollary" for a particular record, BPA must be able to show that Kintama was acting "in a capacity similar to that of an employee" with respect to that record. *Rojas*, 989 F.3d at 674–75. However, throughout the course of its relationship with Kintama, BPA repeatedly affirmed Kintama's independence. Because Kintama's "outsider status was essential to [its] work," *id.* at 675 n.3, BPA cannot claim Kintama as the equivalent of an employee, and thus cannot withhold its communications with Kintama under Exemption 5.

60. For reasons including, but not limited to, the following, BPA's withholding of records under Exemption 5 is improper:

   a. Kintama was not, at any time, acting in the capacity of a BPA "employee," so none of the records at issue are "inter-agency" or "intra-agency."

   b. Many of the records relate to negotiations over future work that Kintama might perform and the contractual terms under which it might perform that work. Such records are not "inter-agency" or "intra-agency."

   c. Many of the records post-date the expiration of Kintama's last contract with BPA and/or are unrelated to the specific work that Kintama did for BPA. Such records are not "inter-agency" or "intra-agency."

      d.  None of the withheld records are both "pre-decisional" and "deliberative." Many appear to contain discussion of ancillary matters not related to internal government policy deliberations, while others relate to Kintama's decisions rather than BPA's decisions.

      e.  BPA cannot establish that release of any of the withheld records will foreseeably harm the interests protected by Exemption 5.

WHEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

A.    Adjudge and declare that all of BPA's Exemption 5 withholdings in its response to FOIA Request BPA-2021-00513-F are improper;

B.    Order BPA to immediately release unredacted (except for non-Exemption-5 redactions) versions of the records previously released to AFW in response to FOIA Request BPA-2021-00513-F;

C.    Enter such other declaratory relief and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by AFW;

D.    Award AFW its reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to FOIA and/or any other provision of law allowing for the recovery of such expenses; and

E.    Grant such further relief as the Court deems just and proper in order to provide AFW with relief and protect the public interest.

Dated: December 15, 2022

Respectfully submitted,

*/s/ Andrew R. Missel*
Andrew R. Missel
Oregon Bar # 181793
Lauren M. Rule
Oregon Bar # 015174
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 506-5133
amissel@advocateswest.org
lrule@advocateswest.org

COMPLAINT                                14